## No. 2102.
### Second Circuit Appeal.

## FRANK IRVINE ET AL.
v.
## MICHAEL J. NOONE

(June 6, 1925, Opinion and Decree.)

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Evidence—Par. 5.**
The court takes judicial cognizance that the sovereignty of the United States had been set aside as a fact in Louisiana and that the State of Louisiana and the Confederacy of which it had become a part were claiming sovereignty on August 8, 1861.

2. **Louisiana Digest—Evidence—Par. 27, 47, 48.**
One who obtains a receipt from the Register and Receiver of the land office after the State of Louisiana had seceded from the United States and become a part of the Confederacy must be presumed to have known that he was not dealing with the United States, but with the power that had replaced it in point of fact.

3. **Louisiana Digest—Laws—Par. 70.**
Under United States Revised Statutes No. 2222, although an officer is authorized to continue in the discharge of his duties until his successor is qualified, it cannot be made to serve the purpose of interrupting the orderly conduct of business and depriving the Government of its property against its consent at the dictation and for the benefit of a hostile power that has assumed temporary control of its territory, its property and its officials.

4. **Louisiana Digest—Laws—Par. 70.**
Where States of the United States secede from the Union it is not necessary for the President of the United States to perform the idle ceremony of accepting the resignation of thousands of Federal officials in the seceded States in order to give formal regularity to proceeding of a civil nature.

5. **Louisiana Digest—Laws—Par. 70, 72.**
The rule that entries made in the land office segregate the land so entered from the public domain and operate as a bar to any other disposition thereof until set aside by formal proceedings to which the entryman must be a party has application only to officers of the United States acting as such.

Appeal from the Thirteenth Judicial District Court of Louisiana, Parish of Rapides, Hon. L. L. Hooe, Judge.

This is a suit to recover a tract of land of which the defendant is in possession under a patent from the United States based on a homestead entry made in 1910. There was judgment for defendant and plaintiff appealed.

Judgment affirmed.

Nachman & Wahlder, of Alexandria, attorneys for plaintiffs, appellants.

Hawthorne and Stafford, of Alexandria, attorneys for defendant, appellee.

CARVER, J. Plaintiffs, as the heirs of Francois Barbier, sue to recover from the defendant a tract of land of which he is in possession under a patent from the United States based upon a homestead entry made in 1910.

They claim to own it by virtue of a Receiver's receipt signed by George Purvis, Receiver, reading as follows:

"No. 23190, Receiver's Office at Monroe, La., Aug. 8, 1861.
"Received from Francois Barbier, of Rapides Parish, La., the sum of thirty-nine dollars and 77 cents; being in full for the Southwest quarter of Sec. 4 and S. E. quarter of Section No. 5 in Township No. 4 N. of Range No. 3 East containing three hundred and eighteen acres and 14 hundredths, at $12½/100 per acre.
"$39.77/100.
"GEO. PURVIS, Receiver."

A copy of Barbier's application and of its approval by R. W. Jemison, Register, the original of which was found on file in the United States Land Office at Baton Rouge, was introduced in evidence and reads as follows:

"No. 23190, Land Office at Monroe, La., August 8, 1861.

"I, Francois Barbier, of Rapides Parish, La., do hereby apply to purchase the SW¼ of Section 4 and SE¼ Section 5 in Township 4 North Range 3 East, containing 318.14 acres, according to the returns of the Surveyor General, for which I have rate of 12½c per acre. Francois Barbier.

"I, R. W. Jemison, Register of the Land Office at Monroe, La., do hereby certify that the lot above described contains 318.14/100 acres as mentioned above, and that the price agreed upon is 12½c per acre.

$39.77/100.

(Signed) R. W. JEMISON, Register."

Defendant plead prescription and also that the Receiver's receipt on which plaintiff declared was null and void because at the date of its issuance the State of Louisiana had seceded from the Union; that the United States Land Office at Monroe had been closed; and that no one was authorized to represent the United States in the disposition of its lands.

The District Judge sustained the plea of prescription and plaintiffs appealed.

D. K. Parrott, acting Commissioner of the General Land Office testified that R. W. Jemison took office as Register on September 29, 1860, and resigned February 19, 1861; that George Purvis took office as Receiver on September 29, 1860; and that "a letter is found in the files of this office which indicates that he resigned April 3, 1861"; that no successors were appointed (meaning, of course, soon thereafter); that the land in question was within the boundaries of the Monroe Land Office District; that Louisiana apparently seceded January 26, 1861; that the Barbier entry was not reported to the General Land Office or entered on its books nor was the price he paid sent there; that though his office had no record of a formal closing of the Monroe Land Office, the last abstract of cash entries sent to the General Land Office before the breaking out of hostilities between the north and south was February 1, 1861; that the last cash entry reported before the Civil war was 23027, dated January 31, 1861; that the office was re-opened for business on December 23, 1867; that the first cash entry after re-opening was January 7, 1873, being number 23028, and the first homestead entry was December 28, 1867; that the General Land Office does not recognize the acts done by the persons in control of the office while it was closed, because they were not lawfully constituted agents of the United States Government; that the persons so in control remitted no moneys and made no reports to the General Land Office during that period.

An extract from the Tract Book in the United States Land Office at Baton Rouge, to which office the records of the Monroe office were transferred, shows, opposite the description of the land in question as follows:

"Claim of Francois Barbier No. 23190, Posted from Surveyor General's map 12/7/06. L. 19379."

A pen is run through Barbier's name, evidently to erase it.

An extract from the Baton Rouge tract book shows opposite the SE¼ of Section 5 as follows:

Francois Barbier 1861 August 8 23190 Cons.

A pen is run through the description of the land, evidently to erase it.

The official plat of Township 4 North Range 3 East on file in the General Land Office does not show Barbier's name.

The plat on file in the Baton Rouge office shows that across the SE¼ of Section 5 and SE¼ of Section 4, which together form one body of land, is written

"Francois Barbier receipt No. 23190".

The copy of this plat filed in evidence bears the following notation:

The north, south, east and west boundaries of this township were surveyed by Charles DeFrance deputy surveyor in the year 1813 and 1814 and the sectional lines were surveyed by Edmund H. Wailes deputy surveyor in November, 1824. Serveyor's Office, Washington, Miss., June 9, 1827. G. Davis, surveyor of public lands south of the state of Tennessee.

Surveyor General's Office, New Orleans, La., January 29, 1908. I certify the above map to be a correct copy of the original now on file in this office.

Surveyor General of Louisiana.

We have not been referred to any law of the United States authorizing Registers and Receivers to sell United States land at a price to be agreed on between land Register and Receiver and the purchaser, nor to any law of the United States, authorizing the sale at so small a price as 12½c per acre nor have we found any such law.

Neither Jemison's approval of Barbier's application to purchase nor Purvis receipt, though signed by them, respectively, Register and Receiver, and though they had been appointed Register and Receiver, respectively, in 1860, appears to have been signed by them as officers of the United States.

This circumstance and the fact that they had resigned and the further fact that they made no remittance of the purchase money nor any report of the sale to the General Land Office and could not in view of the war in progress have remitted or made report, coupled with other facts of which we think we have the right to take judicial notice convince us that in making the sale and issuing the receipt Jemison and Purvis did not assume to act for the United States and the entryman must have known it. At any rate, he must

be presumed to have known that the authority of the United States had been set aside, not as of right but as a fact, and that the state and the Confederacy of which it had become a part, were claiming sovereignty and actually exercising dominion over the territory embracing the land in question and that the state was asserting ownership of all unappropriated land in said territory.

He must be presumed to have known that under prevailing conditions he could not have obtained from the United States or its officers any rights that would be recognized or respected by the power in actual control, and further, that in dealing with the United States or its officers would be regarded as disloyalty to the power so in control, probably entailing severe penalties.

In view of these considerations, we are satisfied that when Barbier obtained the receipt he knew that he was not dealing with the United States but with the power that had replaced it in point of fact.

Were this not the case, though, the result would be the same, because in our opinion the question does not turn on Barbier's knowledge or ignorance of the capacity in which the officers acted but upon the capacity itself in which they did act.

Counsel for plaintiff argues that under ordinary rules of law as well as under United States Revised Statutes 2222 an officer is authorized to continue in the discharge of his duties until his successor is qualified.

The purpose of this law is to insure the continuance in orderly fashion of the Government business, including the protection of its property; it cannot be made to serve the opposite purpose of interrupting the orderly conduct of business and depriving the Government of its property against its consent at the dictation and

for the benefit of a hostile power that has assumed temporary control of its territory, its property and its officials.

We think the *maxim inter arma leges silent* applies to the situation here presented.

Besides, were the officers authorized by this rule to continue in the discharge of their duties, we are satisfied, as said above, that they did not so continue or pretend to do so, but, on the contrary, acted as the agents of the power in actual if not rightful control of the territory at the time.

Counsel also argue that as in law the ordinance of secession was invalid and never recognized by the United States whose title to the property was therefore unaffected by the ordinance and as there is no proper or sufficient proof that the Receiver had resigned, it follows his acts must be regarded as authorized by the United States.

This contention is answered by the consideration already mentioned that in our opinion the officers did not act for the United States but for a hostile power.

As to the proof of the Receiver's resignation not being sufficient, and the argument that it was ineffective until accepted, we think that the situation created, not, indeed by the ordinance of secession but by the consequences ensuing therefrom, chief of which was the actual assumption of sovereignty by the state and the Confederacy over the territory, operated to oust the officers without any resignation or acceptance thereof.

The President of the United States was not required to turn aside from the important duties then engaging his attention looking to the preservation of the Union in order to perform the idle ceremony of accepting the resignations of thousands of Federal officials throughout the south so as to give formal regularity to proceedings of a civil nature. Nor was he required at that busy time to do the vain thing of appointing successors who could not have acted and would have risked severe punishment if they had tried.

Counsel invoke the rule that entries made in the land office segregate the land so entered from the public domain and operate as a bar to any other disposition thereof until set aside by formal proceedings to which the entryman must be a party.

This rule, we think, has application only to entries made by officers of the United States acting as such.

The Federal Government in liquidating the civil war was not obliged to bring millions of suits to regain its property or to cancel attempted dispositions thereof made under authority of the Confederate Government or its constituent states. Such attempted dispositions were absolutely void and needed no judicial pronouncement to make them so in law, and no other proceedings than the collapse of the Confederacy to make them so in fact.

Counsel also argue that the law did not require remittance to the General Land Office or report of the entry to that office in order to make it valid. That is true. But it did require that the entry and money be received by officers of the United States authorized to act and actually acting as such.

Of course the notation on the map in the Baton Rouge Land Office shows on its face that it was a mere memorandum of the entry number 23190 of August 8, 1861, and is no evidence of any prior claim.

Our conclusion on this branch of the case renders it unnecessary to pass on the question of prescription.

Since writing the above, we find the case of Betts vs. I. C. R. R. Co., 52 La. Ann. 918, 24 South. 644, which refers to legisla-

tion of 1861, the books containing which legislation are not available to us at present.

According to the report of that case, though, the secession convention after passing the ordinance of secession of January 26, 1861, passed an ordinance on February 12, 1861, assuming control and ownership of all unappropriated public lands in the state, and that the legislature, on March 27th of that year, passed an act being remodelling the State's Federal Land Office. Provision was made in section 10 for a Register and Receiver to be appointed by the Governor for each of the local land offices. In section 12 provided "that the several Registers and Receivers appointed under this act shall receive and take charge of all the maps, books, papers, furniture, etc., of the several land offices of the United States". Section 13, provided "that for the sale of the public lands in the state is divided into five land districts corresponding and being the same as the several land districts of the late United States and a state land office shall be established each place where the late United States had a United States land office". Section 14 "that provided all lands belonging to or claimed by the state shall be sold and disposed of at the land office of the district in which the land may be situated".

The statute so referred to confirms us in the conclusion which we had reached without reference thereto that Purvis and Jemison in allowing the entry in question did so not as officers of the United States but as officers of the state having doubtless been appointed as such, although there is no proof in the record to that effect.

The judgment of the lower court rejecting plaintiff's demand is correct and for the reasons above given it is affirmed.